**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| WALTER ROBINSON, | : | CIVIL ACTION NO. 06-935 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| HOME DEPOT, INC., | : |  |
|  | : |  |
| Defendant. | : |  |

**COOPER, District Judge**

Plaintiff, Walter Robinson, commenced this action against
defendant, Home Depot, Inc., alleging racial discrimination
through failure to promote and hostile work environment in
violation of 42 U.S.C. § ("Section") 1981 and Title VII of the
Civil Rights Act of 1964, Section 2000e-2(a).  (Dkt. entry no.
20, 3d Am. Compl.)  Defendant moves for summary judgment in its
favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.
(Dkt. entry no. 50.)  Plaintiff opposes the motion.  (Dkt. entry
no. 53.)  The Court heard oral argument on July 23, 2009.  The
Court, for the reasons stated herein, will grant the motion in
part and deny the motion in part.

**BACKGROUND**

**I.   Overview of Plaintiff's Employment History at Home Depot**

Plaintiff, an African American, commenced employment as a
sales associate at Store No. 914 in Mount Laurel, New Jersey (the
"Mount Laurel store") in October 1997.  (Dkt. entry no. 53, Def.

Br., Ex. A, Pl. Dep. at 144-45.)  Plaintiff was promoted to Front End Supervisor in October 1998.  (Id. at 308-09.)  After approximately two years, plaintiff was reassigned to the Credit Card Sales Department, and, in January 2002, the Deliveries Department.  (Id. at 308-09, 323, 349-50.)

Plaintiff transferred to Store No. 976 in Ewing, New Jersey (the "Ewing store") in October 2002.  (Id. at 358-60.)  Upon his arrival, plaintiff was promoted to Pro Desk Supervisor, a management position.  (Id. at 359-60.)  Plaintiff resigned from the management position in October 2005, and, in approximately November 2005, was transferred to the Appliances Department as a sales associate. (Id. at 505-07.)  Plaintiff subsequently moved to the Cross Merchandising Department as a sales associate in September 2006, and became the Lead Generator Specialist for the Wall and Floor Covering Department in January 2007.  (Id. at 508, 533.)

Plaintiff later transferred to Store No. 939 in Burlington, New Jersey (the "Burlington store"), where he was employed at the time of briefing.  (Def. Br. at 3.)

## II.  Plaintiff's History and Performance at the Mount Laurel Store

Plaintiff commenced employment at the Mount Laurel store as a sales associate in the Millwork Department.  (Pl. Dep. at 144-45.)  He alleges that, while in this position, he was once informed by another African American sales associate that there

2

was a hangman's noose hanging over a forklift at the store.  (Id. at 588-93; 3d Am. Compl. at 2.)  Plaintiff proceeded to the scene of the alleged incident, but upon arrival was told by another sales associate that "somebody had taken it down and . . . done something with it."  (Pl. Dep. at 593.)  Plaintiff did not report the incident to a manager.  (Id. at 599.)

After being trained in the Millwork Department, plaintiff was transferred to the Electrical Department in June 1998, where he contends he was "noticed for leadership skills and sent for supervisor training."  (Id. at 221-22, 600; see 3d Am. Compl. at 3.)  Plaintiff was reassigned to Head Cashier in October 1998, and, later that month, was promoted to Front End Supervisor. (Id. at 221-22, 308-09, 349.)  He contends that, as Front End Supervisor, he received, inter alia, a "Badge of Merit[]" from the company for his work in replacing many damaged uprights by hand.  (3d Am. Compl. at 3.)

After two years as Front End Supervisor, plaintiff was reassigned to the Credit Card Sales Department, but states that he was given no reason for the sudden change in positions.  (Id. at 308-09.)  He asserts that at the time of his arrival, this was "another Department in disarray," but after holding the position for only three weeks, the department increased from being rated 998 out of the 1200 nationwide Credit Card Sales Departments to 17.  (3d Am. Compl. at 4.)  Plaintiff further asserts that he was noted as producing "outstanding results" in the department, which

3

had the role of  "canvass[ing] people when they c[a]me in the door" to open Home Depot accounts.  (Pl. Dep. at 308.)

Plaintiff contends, however, that while in the Credit Card Sales Department, his sales table was moved, during the cold winter months, in front of the vestibule where the doors to the building opened as a result of his race, although he was told it was due to a "Garden reset" and he worked under those conditions only for a few days.  (Id. at 648, 656 (noting "Why would you move my table and put it right in front of the door in the wintertime? [The manager] didn't do it to anybody else that was working in any other department. . . . [It was b]ecause we didn't get along"), 660.)  Plaintiff soon after, in January 2002, transferred to the Deliveries Department as a Delivery/Will Call associate.  (Id. at 323, 350.)

While in his various positions, plaintiff received annual performance reviews.  The reviews were generally satisfactory or

favorable, noting, <u>inter</u> <u>alia</u>, his skill at interacting with customers and motivation to perform well.[1]  The reviews, however, specifically noted areas in which plaintiff's performance needed to improve, including his alleged confrontational nature and his interactions with other employees.[2]

---

[1]  Plaintiff received various positive comments during the reviews.  (<u>See, e.g.</u>, Def. Br., Ex. E, D-13, 2-25-98 New Associate Review (noting he was "[f]riendly and courtious [sic] with customers" and "thorough in fulfilling the customers [sic] needs"); <u>id.</u>, Ex. D-22, 2-5-99 Review (noting plaintiff is "[r]espectful" and has a "[d]esire to succeed"); <u>id.</u>, D-28, 2-7-00 Review (noting plaintiff "produced outstanding results, [had g]reat procedural knowledge[, was  c]ustomer friendly[, and h]andle[d] a lot of issues without mgmt. involvement"); <u>id.</u>, D-31, 1-4-01 Sales Associate Appraisal ("[Plaintiff] constantly makes our customers a [number] 1 priority and pushes all associates to do the same.  Remains calm under high stress situations and resolves any differences with professionalism.  Great job here!!"); <u>id.</u>, D-38, 12-19-01 Sales Associate Performance Appraisal (noting, <u>inter</u> <u>alia</u>, plaintiff is "definitely an asset to Home Depot," "takes on other tasks that aren't his responsibility or even asked of him that greatly impact the store and the bottom line," and "all of his extra efforts are appreciated and seen by all"); <u>id.</u>, D-40, 6-11-02 Performance and Development Summary (stating plaintiff "is a hard worker and takes pride in his work").)

[2]  Areas for plaintiff to improve were specifically documented in his reviews.  (<u>See, e.g.</u>, Def. Br., Ex. E, D-22, 2-5-99 Review (noting plaintiff needs to improve with "[s]upervision, knowledge of job duties, scheduling for [customer], ownership of front end, [and] moral"); <u>id.</u>, D-34, 6-30-01 Review (noting plaintiff "needs to focus . . . to refine [and] improve his knowledge"); <u>id.</u>, D-38, 12-19-01 Sales Associate Performance Appraisal (noting he is "unable to handle large workloads," "has many problems with the way the schedule is written and sometimes expresses this with other associates," and warned that "not all associates know how to handle such aggressive feedback"); <u>id.</u>, D-40, 6-11-02 Performance and Development Summary (noting "[i]t can be difficult to give [plaintiff] constructive criticism because he is so passionate about his work and can be defensive.  [Plaintiff's] passion and commitment to excellence often causes conflict when dealing with people").)

Plaintiff was also counseled for various performance violations between March 1998 and August 1999, including for working overtime without approval, failing to replace price tags in his area of responsibility after being asked to do so, writing orders that included errors, running a cash register that was over count, failing to take proper action when informed that a register till was missing, and accepting a check from a customer that should have been declined.  (See, e.g., Def. Br., Ex. E, D-14; id., D-15; id., D-16; id., D-17; id., D-23; id., D-24; id., D-25.)

Plaintiff, however, contends that at least one of the performance violations he was written up for was based on his race.  (Pl. Dep. at 164-66, 586-87.)  Specifically, he contends that Caucasian employees also worked overtime without approval, but were not disciplined in any fashion for such actions.  (Id.; see 3d Am. Compl. at 2.)

Plaintiff, moreover, contends that while at the Mount Laurel store he met with the Store Manager and a Regional Director to express his desire to move into management and his willingness to take the necessary steps toward promotion.  (Pl. Dep. at 677-78.)  He states that the meeting concluded with the Store Manager stating he would create a "game plan" for plaintiff to move up within the company.  (Id.)  According to plaintiff, the Store Manager did not implement the management plan and he had to write his own.  (Id.)

6

Plaintiff subsequently sought a transfer to a Home Depot store in Virginia, which was approved by management. (Id. at 705, 708-11.)  He alleges, however, that two  weeks prior to his scheduled transfer, while in the process of purchasing a home in Virginia and his family had already relocated, he was told that he would receive a 20-21 percent pay cut in Virginia, and thus could not accept the transfer. (Id. at 711-24.)  He contends that, thereafter, management refused to support him in his efforts to remain in his current position at the Mount Laurel store. (3d. Am. Compl. at 5.)

## III. Plaintiff's Pertinent History and Performance Reviews at the Ewing Store

Plaintiff was contacted by a manager that had recently transferred to the newly opened Ewing Store and offered a promotion to a management position at the new store – Pro Desk Supervisor . (Id.)  Plaintiff accepted the position and transferred to the Ewing store in October 2002. (Id.; Pl. Dep. at 358-60; see Def. Br., Ex. E, D-41.)  Factors used by Home Depot to assess eligibility for management openings include the employee's performance ratings, years-in-title in a specific location, and a manager's agreement. (Dkt. entry no. 53, Benson Decl. at 2.)  Pro Desk Supervisor, although not a salaried management position, is a Department Head position. (7-23-09 Oral Hearing.)  Per Home Depot policy, Department Heads receive training for potential promotions to the two salaried management

7

positions – Assistant Store Manger and subsequently Store Manager.  (Id.; Benson Decl. at 2; Pl. Dep. at 771-72.) Department Heads are the only employees eligible to be promoted to the salaried management positions.  (Benson Decl. at 2; Pl. Dep. at 771-72; 7-23-09 Oral Hearing.)

Plaintiff's first review upon his promotion to Pro Desk Supervisor was in January 2003.  (See Def. Br., Ex. E, D-42, 1-28-03 Performance and Development Summary.)  Plaintiff received the rating of "B - Achiever" for  his overall performance, and the rating of "2 – Effective" for his leadership ability.  (Id.)[3] The reviewer noted that plaintiff "continually strives to improve performance of his entire department and store," and "possesses a unique combination of skills that makes him a true asset to the store."  (Id.)  The reviewer, moreover, specified tasks and areas for plaintiff's performance to further develop.  (See id.) Regarding his potential for promotion, plaintiff was noted as needing to grow in his current position.  (Id.)

Plaintiff, while Pro Desk Supervisor, purchased a fan from the store for $74.18 on July 17, 2003, but was subsequently asked by management to provide proof that he purchased the product.

---

[3] Home Depot's scale for rating overall performance was defined as: "A-Outstanding;" "B-Achiever;" "C-Performer;" and "D-Improvement Required."  (Def. Br., Ex. E, D-42.)  Later reviews defined the alphabetical code as: "O-Outstanding;" "V-Achiever;" "P-Performer;" and "I-Improvement Required."  (See, e.g., id., D-44.)  The scale for rating leadership ability was defined as: "1-Exemplary;" "2-Effective;" "3-Acceptable;" and "4-Deficient." (Id., D-42.)

(Pl. Dep. at 811-18; 3d Am. Compl. at 6.)  Plaintiff asserts that management conducted the questioning, accusing plaintiff of stealing, in an "aggressive" fashion in front of other employees. (Pl. Dep. at 811-20.)  Plaintiff contends that the "embarrassing" incident was a result of his race, as other employees were not accused of stealing items they had rightfully purchased.  (Id. at 816.)  Plaintiff admits, however, that other employees of various race and ethnicity were in fact confronted for stealing from the store while he was employed there.  (Id. at 1106-07.)

Plaintiff's next review was conducted in August 2003.  (See Def. Br., Ex. E, D-44, 8-1-03 Performance and Development Summary.)  Plaintiff's rating for his overall performance fell to "P-Performer," while his rating for his leadership ability fell to "3-Acceptable."  (Id.)  Plaintiff was again commended on his ability to interact with the customers and his positive attitude, but told that improvement was needed in, inter alia, managing the employees in his department.  (Id.; see also id. ("He knows his customers").)  Plaintiff was told, inter alia, that he must ensure that he is aware of the location, training, and sales plans of his employees.  (Id.)  Regarding his "potential," plaintiff was again noted as needing to grow in his current position.  (Id.)

Plaintiff asserts that, in August 2003, he was accused of conspiring with an African American contractor to steal from the store, and forced to return his set of store keys.  (3d Am.

9

Compl. at 6.)  He contends that he was told that the contractor
had been caught stealing and management accused him of being
involved because the contractor was "his boy."  (Pl. Dep. at 780,
793-97.)  Plaintiff responded that, although the contractor was
also African American, management had no reason to infer the
contractor was "his boy."  (Id. at 796-97 ("I says, he come in to
do business.  We sell him product.  He pick his product up and
that's all I know.  So don't come and tell me some old
foolishness where he's my boy.  Why, because he's black. . . .
[The Manager] did not say another word.").)  Plaintiff is not
aware if an investigation into the allegation was ever commenced.
(Id. at 793.)  Plaintiff later stated that he was not certain his
race had anything to do with this discussion of conspiring to
steal with the contractor.  (Id. at 821.)[4]

    Plaintiff's next review was conducted in November 2003, and
his ratings again fell.  (See Def. Br., Ex. E, D-48, 11-14-03
Performance and Development Summary.)  Plaintiff's rating for
overall performance was an "I-Improvement Required," and the
rating for his leadership ability was marked as "4-Deficient."
(Id.)  Regarding promotion potential, rather than needing to grow
in his position, plaintiff's potential was listed as "Placement

---

[4]  Plaintiff also contends that, at some point in 2003, there was
an additional incident where he was told by a manager that "the
shrink numbers proved he was stealing and that he would be
fired."  (3d Am. Compl. at 6.)  He asserts that he told the
manager that he "welcomed an investigation because he never stole
anything from Home Depot."  (Id.)

Issue."  (Id.)  The reviewer noted:

> [Plaintiff] has had many errors resulting in [Point of
> Sale] discrepancies and accountability issues.
> [Plaintiff] does not understand the system completely
> and what effect the special services system has on the
> Point of Sale system.  [Plaintiff] as the Department
> Head must be the mentor for the other associates at the
> desk. [Plaintiff] becomes very defensive when any errors
> are pointed out.

(Id.)  Plaintiff, moreover, was told that he needed key

development in product knowledge, self-development, customer

service, knowledge of systems, and shrink awareness.  (Id.)

As a result of the poor November 2003 review and difficulty

in executing the "special services system," plaintiff was placed

on a Performance Improvement Plan ("PIP") for 60 days, and told

that his employment would be terminated without significant

improvement.  (Id.)  Plaintiff contends that he "had no choice

but to sign [the review] through harassment and intimidation" and

that, prior to this review, he "had all outstanding performances

with the company," and thus this "bad review [was] completely

false and out of line."  (3d Am. Compl. at 5.)  He asserts that

he was placed on the PIP because of his race.  (See Pl. Dep. at

436, 443-44, 777.)

Plaintiff's ratings improved in his next review in January

2004.  (Def. Br., Ex. E, D-51, 1-4-04 Performance and Development

Summary (noting plaintiff had "successfully completed his

retraining period").)  His overall performance rating increased

to "P-Performer," and his leadership rating increased to "3-

11

Acceptable," while his "potential" once again was listed at "Grow
in Position." (Id.)  While necessary improvement areas were
noted, plaintiff was recognized for his strengths in dealing with
customers and his dependability. (Id.)  Plaintiff was
subsequently named Supervisor of the month in May 2004, and
received a $75 bonus. (Def. Br., Ex. E, D-53.)  Plaintiff was
next reviewed in July 2004, without a change in his ratings, and
the reviewer noted that plaintiff had "made great strides at the
Pro Desk." (Id., D-54, 7-22-04 Performance and Development
Summary.)

     Plaintiff's ratings again increased in February 2005,
receiving an overall performance rating of "V-Achiever," and a
rating of "2-Effective" for leadership. (Id., D-55, 2-05
Performance and Development Summary.)  The reviewer acknowledged
that plaintiff "had shown great improvement in performance," but
noted, inter alia, that he "needs to learn to adapt his approach
to each individual he comes in contact with," and to "energize"
and "treat Associates consistently, fairly and with compassion."
(Id.)  The reviewer concluded that "with continued progress and
improvement," he could see plaintiff "being promoted within the
next two years," and, for the first time, plaintiff was given a
"Promotable" code for his "potential." (Id.)

     Plaintiff emphasizes that, in 2004, his "sales numbers
showed he achieved approximately $1.8 million," which was
"$600,000 over the sales plan" during "a hard year" and noted in

his review.  (3d Am. Compl. at 6; <u>see</u> Def. Br., Ex. E, D-55.)  He
asserts, however, that, even with these results, his Assistant
Store Manager referred to him in a department meeting as "the
worst manager that I've ever seen," and stated that "the Pro Desk
is the worst Pro Desk in the whole district."  (Pl. Dep. at 970-
76.)  Plaintiff, the only African American at the meeting,
contends that the other meeting attendees laughed at the
manager's comments.  (<u>Id.</u> at 974; <u>see</u> dkt. entry no. 54, Pl.
Exs., P-5, 10-17-05 Letter.)

Plaintiff's rating fell in his next review in September
2005.  (<u>See</u> Def. Br., Ex. E, D-56, 8-05 Performance and
Development Summary.)  Plaintiff's performance rating fell to a
"P-Performer," and his leadership rating fell to a "3-
Acceptable," while his "potential" was lowered from "Promotable"
to "Grow in Position."  (<u>Id.</u>)  While acknowledging that plaintiff
excels in customer service and is "always honest and
trustworthy," the reviewer noted, <u>inter alia</u>, that plaintiff
needed to "find a way to create a cohesive team and be more
sensitive to [employees'] needs," "take personal responsibility
for [his] own learning and development," and "hold self and team
accountable for performance."  (<u>Id.</u>)  The reviewer explained:

> Over the past 6 months [plaintiff's] performance has
> not been consistent with company standards or
> expectations.  Even though [plaintiff] has great
> knowledge of the Pro business and demonstrates above
> average customer service, [plaintiff] must pay closer

attention to detail in regards to accountability of his associates.

(Id.)

Plaintiff disagreed with the evaluation of his performance, refused to sign the review, and asserts the meeting in which he was given the review "got heated."  (Pl. Dep. at 481-89.) Plaintiff contends he was insulted by the "scathing remarks" regarding his performance and when the reviewing manager, aware that plaintiff was unsatisfied with the review, told him to "take it home and . . . let [his] wife review it."  (Id. at 489-90 ("My wife doesn't have anything to do with this so why are you bringing my wife into it. . . . That's an insult."); 3d. Am. Compl. at 7.)  Plaintiff further contends that he walked out of the review "after being provoked into a physical confrontation." (3d. Am. Compl. at 7.)

Plaintiff contacted the Home Depot Awareness Line after the meeting, reporting the reviewing manager to be "very unprofessional for making the comment about his wife."  (Pl. Exs., 9-2-05 Awareness Line Report.)  Plaintiff also reported that he "does not receive support from management and he feels that he is singled out," and "up against a 'firing squad,' because Management does not give him any support."  (Id.)  Home Depot investigated and concluded "after speaking to all parties involved the appropriate action has been taken by management. [Plaintiff's] review was based on facts and the rating was round

14

tabled with the other [Assistant Store Managers], [the Store Manager], and [the] District Pro Manager for consistency." (Pl. Exs., 9-8-05 Investigation Log.) The investigation also noted, inter alia, that although plaintiff "feels his desk is under staffed and has never had the right people," over the course of the last year, "his desk has only been 20 hours under for three weeks due to a termination. He has been even over staffed at times. Most recently he has been given a Millwork specialist to help drive sales. We are also going to run his desk over 40 hours to give him even more help. [Plaintiff] just doesn't hold himself or his team accountable for the metrics they are supposed to reach." (Id.)

Plaintiff was subsequently transferred to the Appliances Department as a sales associate, a non-supervisory position, in approximately November 2005. (Pl. Dep. at 505-07; see Def. Br., Ex. E, D-59 (record noting "Voluntary Demotion").) Plaintiff's hourly wage decreased from $22.05 to $20.06. (Pl. Dep. at 1208.)[5] Home Depot contends plaintiff was voluntarily reassigned because, in October 2005, he expressed his intent to relinquish his management position, which was accepted on November 21, 2005. (Def. Br. at 3; see Pl. Dep. at 505; Pl. Exs., P-5, 10-17-05 Letter.)

---

[5] Plaintiff contends the salary decrease was due to his race, claiming at least two non-African American employees who relinquished their management positions did not receive a pay decrease. (Pl. Dep. at 1208.)

15

Plaintiff, however, asserts that he did not "voluntarily" relinquish his management position, but that he had no choice to resign because of the lack of support he received from management.  (3d Am. Compl. at 6; Pl. Dep. at 847-49; Pl. Exs., P-5, 10-17-05 Letter.)  He contends that although he tried to work with management and work out the issues, his efforts were to no avail.  (Pl. Dep. at 847-51.)[6]  Plaintiff asserts that he was consistently "forced to work with . . . a hostile management team" that "attacked him regularly and caused . . . confrontations with groups of employees," and he was forced to resign because "the situation became so hostile that it affected his health."  (3d Am. Compl. at 6-7.)[7]

---

[6] Plaintiff contends that, after the September 2005 review meeting, he attempted to explain his concerns to management, stating:

> I come here and I bust my butt. I have my people flowing.  We get good numbers.  Last year we got an excellent profit sharing check.  I says and you can't even get me people that can produce.  And I says the thing of it is, you give me a messed up review and then you talk about I don't get along with people and I'm telling you that I hold my people accountable and I don't let them roam.  And if you can't give me that support, then you get somebody else to run your Pro Desk.

(Pl. Dep. at 847-51.)

[7] Plaintiff asserts that, due to the lack of support from management, he was forced to "immediately . . . seek medical attention for High Blood Pressure," and "had difficulty sleeping due to his constant strain in dealing with animosity on a daily basis."  (3d Am. Compl. at 7.)

Plaintiff sent a resignation letter to the Home Depot

Chairman, President, and Chief Executive Officer, dated October

17, 2005, stating:

> This is to inform you that effective immediately I am
> relinquishing my position as Pro Desk Manager.  This
> decision is being made because of the lack of support I
> have received from management.  I have worked in the
> Ewing Township store for 3 years.  During that time I
> have grown the business and provided a professional
> level of support to the customer base.  On numerous
> occasions when I have needed the support of management
> and [the Human Resources Department] based on internal
> issues it has not been forthcoming.  In fact there have
> been numerous times when I was antagonized by
> management.
>
> Often I suffer verbal abuse from my subordinates.  When
> I report this to management they refuse to intercede.
> This engenders a lack of respect and attitudes which do
> not reflect cooperation.  The result is an environment
> of stress.  When upper management does not support front
> line managers then employees become defiant and
> disrespectful.  It is a situation that is wearing on my
> physical and emotional well being.  It is intolerable.
>
> My experience in the store speaks for itself.  I am the
> Go To person in the store from all departments.  When
> there are issues with customers I am generally called
> upon to resolve them.  On occasion I have had to assume
> management responsibilities to handle and diffuse
> situations.  The customer base has grown to appreciate
> my knowledge and professionalism.  I have enjoyed a high
> level of support among contractors and the general
> public.  Contractors ask for me when patronizing the
> store quite often.  I am proud of my level of service
> during my tenure at this location.
>
> One of the reasons for my level of dissatisfaction is
> the lack of management opportunities.  I have been an
> employee of Home Depot for 8 years and during this time
> I have seen others promoted with less experience and
> knowledge.  This is puzzling because Home Depot is
> supposed to be an Equal Opportunity Employer and yet
> most of the promotions have been Caucasians.  As an
> African American it is frustrating because though I am
> not paid to be a manager I often function as one.  Many

17

times I find myself assisting those promoted over me.
It is a situation that makes me feel that Home Depot has
no degree of appreciation for what I mean to the
organization.

As an example recently an African American customer had
a problem being served in the store.  He was refused
service because of the shade of his skin and he was
quite perturbed.  I believe he called the President of
the company and has communicated to me that he feels
this store has a problem.

In another situation a customer waited 40 minutes for a
manager to come and resolve his issue.  The first
manager was Rich Altenberg who stated that Pete, the
[Manager on Duty], would take care of the situation.
However Pete had left for the day.  Stacey the return
cashier called Mr. Kelley and I sprinted from one end of
the building to the other.  There was paint thrown down
the light bulb aisle and in the front entrance to the
store.  It was thrown by an irate customer based on lack
of service by management.  I was castigated by Rocco the
store manager because I mentioned that managers need to
be more attentive to diffuse situations such as this.  I
was told that I should stop bashing management because I
mentioned that situations like this need to be handled
promptly.  This irate customer is a paint contractor who
patronized the store.  He was expressing his frustration
about being ignored.

Recently at a Pro Desk meeting I was degraded in public.
This was done by my immediate manager in front of my
peers in the region and management.  His merit less
comments talked about my lack of ability despite the
fact that my department does a significant percentage of
store business.  The contractor base represents
approximately 35% of the store business and I do
approximately 8% of the contractor business on paper.  I
can produce letters of support from numerous contractors
on my knowledge and professionalism.  Yet from the
manager who is supposed to support and supervise me, I
get a scathing review in public that could not be
described by any other way than a lynching.  No manager
came to my defense despite the fact that they know the
truth.  It was devastating.

These situations leave me wondering what my place in
this organization is.  I have been a faithful and
productive employee who deserves a management position.

18

I see so few African American managers.  It makes me
feel that racism is the standard by which promotions
occur.  It is a disturbing situation.

(Pl. Exs., P-5, 10-17-05 Letter.)

Plaintiff emphasizes that "customers on numerous occasions
have complemented [him] on his courteousness, knowledge and
helpfulness to others."  (3d Am. Compl. at 8; see generally Pl.
Exs.)

Plaintiff contends that there were specific incidents in
which he feels he was not supported by management, for instance,
with the issues he had with Clarence Boone, an African American
Pro Desk sales associate.  (Pl. Dep. at 460-67, 845-87, 878-79.)
He contends that Boone would "cuss . . . [him] out all the time,"
and that he attempted to report Boone for this behavior, but
management supported Boone over plaintiff and did nothing to
alleviate the situation.  (Id.)

Plaintiff further contends that there was an incident in
which a customer started "cussing and acting crazy" due to an
error in his order.  (Id. at 866.)  He asserts that when he told
the customer that his language would not be tolerated, the
customer responded by threatening plaintiff and suggesting he
"bring [his] old ass outside."  (Id. at 869-72.)  Plaintiff
contends he called for the manager on duty, but a manager did not
respond.  (Id. at 870-72.)  Plaintiff later questioned management
for not helping diffuse the situation, but contends he was given
no legitimate reason other than that management believed he had

19

the management skills to handle the situation.  (Id. at 872-73.)
Plaintiff also contends that he wanted "good, qualified people"
staffed on his team, but management refused to support him in
this area as well.  (Id. at 505-06, 848-61.)[8]

Plaintiff again called the Home Depot Awareness Line
regarding his fall review on February 1, 2006, stating he had
since contacted the Awareness Line several times and was being
retaliated against as a result.  (Pl. Exs., P-47, 2-1-06 Home
Depot Awareness Line Report.)  On this specific occasion, the
hotline log shows that plaintiff also reported:

> He was wearing an apron on which someone had marked the
> letter 'x.' [The Department Head] put his name on an
> apron and said 'This stuff does not go on at Home Depot.
> And you're to wear this apron? Do you understand that?'
> [The Department Head] slammed down the apron.
> [Plaintiff] did not respond to [the Department Head].
> [Plaintiff] felt that [the Department Head] had degraded
> him.  [The Department Head] was supposed to wear an
> apron.  However, he seldom wears one.
>
> [Plaintiff] feels that [the Department Head] is
> discriminating against him because of his ethnic group.
> He feels that this is the reason he is singled out.  He
> wants the harassment to stop.  He is tired and unhappy
> of going to work to be humiliated.  He just wants to go
> to work to do his job.

(Id.)  Home Depot investigated, and concluded that the Department
Head had merely noticed plaintiff's apron had an "X" where his
name should have been, brought him a new apron with his name on

---

[8]  Plaintiff, however, notes that it was difficult to locate
qualified applicants for the Ewing store, and stated "it is hard
to say" whether management's failure to provide him with
additional associates was motivated by his race.  (Pl. Dep. at
863, 1017-19.)

it, and directed him to use the new one.  (Pl. Exs., 3-7-06
Associate Issue Response Form.)

Plaintiff, moreover, contends that there were additional
incidents that took place while he was Pro Desk Supervisor that
created a hostile work environment.  He asserts that on one
occasion he was walking with a Store Manager who pointed to a
product's packaging that referred to the color of the product as
"negro," the Spanish word for the color black.  (Pl. Dep. at 903-
11.)  He contends that he asked the Store Manager what he meant
by that, and the Store Manager "gave [him] a little smirk and
said nothing else about it."  (Id.)  Plaintiff asserts that he
did not report the incident to anyone because "[s]ometimes you
have to just look at ignorance as ignorance.  You have to just
say a prayer and just keep moving."  (Id. at 911.)

Plaintiff further asserts that one day after a department
meeting was held, at which he felt a Pro Desk associate had
disrespected him, he overheard the Pro Desk associate telling a
Department Head: "yesterday we had that meeting and you see what
white power can do."  (Id. at 1000-01.)  He contends that he did
not report the incident to human resources because the Human
Resources Manager had a close relationship with one of the two
employees, and he "didn't have the faith or the trust in the
management to do anything about it because they [hadn't] done
anything in the past."  (Id. at 1002.)

Plaintiff also contends that there was an Assistant Store Manager who referred to the Ewing store as the "ghetto store" on a daily basis, and another Assistant Store Manager that used the term on at least more than two occasions.  (Id. at 1105-06, 1132-33.)  Plaintiff argues that the comments were "absolutely" racially motivated, and he understood the comments to mean the store "[w]ould be trash," "wasn't crisp," and "everything wasn't in line," and that the store was referred to as that term "due to the people that work there . . . [and the] environment."  (Id. at 1105-06.)

Plaintiff, moreover, alleges that there was a Pro Desk associate who drove a car with a Confederate flag sticker in the rear window.  (Id. at 997-99.)  The associate, however, did not display the flag in Home Depot, and plaintiff did not complain to management or human resources about the sticker.  (Id.)

Plaintiff stated that he thought any hostility on the part of management centered on the fact that plaintiff was not "the average employee of Home Depot."  (Pl. Dep. at 1131 ("I'm not the 'yes man.' I'm not the one that will – if you tell me that it's white and it's blue, then I will say well, you know, I think you're wrong, man, it's blue.  And they don't like that.").)

After being reassigned as a sales associate in the Appliances Department, plaintiff alleges, in March 2006, he found a rope tied like a noose lying "jumbled up" on the counter in the training room.  (Id. at 1136-40; Pl. Exs., 3-3-06 Awareness Line

22

Report.)  Plaintiff brought the rope to an Assistant Store Manager, who brought it to the attention of the Human Resources Manager.  (Pl. Dep. at 1137-38.)  Plaintiff also called the Home Depot Awareness Line to report the incident as racial discrimination.  (Pl. Exs., 3-3-06 Awareness Line Report.)  The store immediately commenced an investigation, and Human Resources managers held a meeting with plaintiff regarding the incident. (Pl. Dep. at 1142-44.)

Plaintiff moved to the Cross Merchandising Department as a sales associate in September 2006, and the Wall and Floor Covering Department in January 2007.  (Id. at 508, 533.) Plaintiff asserts that there was another noose incident at the Ewing store in 2007, but he was not present for it.  (Id. at 1148.)  He was told by another employee that a noose had been hanging in the store, and the Home Depot Awareness Line had been called.  (Id. at 1149-51.)  Plaintiff subsequently transferred to the Burlington Store. (Def. Br. at 3.)

## IV.  Procedural History

Plaintiff filed the Complaint on March 1, 2006, and amended the Complaint on March 6, 2006, and April 20, 2006.  (See dkt. entry nos. 1, 2, 5.)  The Complaint and Amended Complaints were dismissed on August 31, 2006, for, inter alia, failure to exhaust administrative remedies under Title VII.  (See dkt. entry nos. 13, 14.)

Plaintiff subsequently filed the Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 18, 2006, alleging he was "denied promotions, harassed and otherwise subjected to a hostile work environment, and constructively discharged, because of [his] race (Black) and/or in retaliation for . . . having complained to the Respondents/Defendants about such discrimination." (Def. Br., Ex. E, D-10, 9-18-06 EEOC Charge of Discrimination.) Plaintiff's right to sue letter from the EEOC was issued on October 23, 2006. (3d Am. Compl., Ex. 1.)

The action was reinstated on December 8, 2006, and plaintiff filed the Third Amended Complaint with one count on January 9, 2007, alleging violations of Title VII and Section 1981. (Dkt. entry nos. 17, 20.)[9] Home Depot now moves for summary judgment in its favor. (Dkt. entry no. 50.) Plaintiff opposes the motion. (Dkt. entry no. 53.)

---

[9] Plaintiff also appears to allege breaches of fiduciary duty and the implied covenant of good faith and fair dealing through the disclosure of plaintiff's confidential information to third parties. (3d Am. Compl. at 8; dkt. entry no. 53, Pl. Br. at 5-6.) Plaintiff, however, has filed the Third Amended Complaint with only one count. (See 3d Am. Compl.) As noted at the July 23, 2009 hearing, the Court does not see a basis for these claims as breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing are not concepts encompassed under Title VII or Section 1981. The Court will consider all evidence submitted in opposition by plaintiff, but it will only do so in the context asserted in the one count Third Amended Complaint.

24

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the movant has met this prima facie burden, the non-movant must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could

25

reasonably find for the [non-movant]." Id. at 252.  "By its very

terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact."

Id. at 247-48.  A fact is material only if it might affect the

action's outcome under governing law.  Id. at 248.  "[T]here is

no issue for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that

party.  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Id.

at 249-50 (internal citations omitted).

## II.  Scope and Time Frame of Claims

### A.    Title VII Claims

Title VII prohibits employment discrimination because of

race, color, religion, sex, or national origin.  42 U.S.C. §

2000e-2(a)(1).  The jurisdictional prerequisites to an action

under Title VII are the filing of an administrative charge with

the EEOC, or similar state agency, and the receipt of an

administrative determination or a right to sue letter.  Id. §

2000e-5; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798

(1973) (noting that prerequisites to filing Title VII civil

action are the timely filing of charges of discrimination with

the EEOC and receiving the EEOC's statutory notice of the right

to sue); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99

(3d Cir. 1976).  The subject matter and the claims which may be
asserted in the subsequent civil action are those which would
reasonably be encompassed within the scope of the resulting EEOC
investigation, regardless of the actual scope of that
investigation, including new acts which occur while the EEOC
charge is pending.  <u>Antol v. Perry</u>, 82 F.3d 1291, 1295 (3d Cir.
1996); <u>Hicks v. ABT Assocs.</u>, 572 F.2d 960, 964-67 (3d Cir. 1978)
(same).  Home Depot raises no objection to the substantive scope
of the Third Amended Complaint's Title VII claims of racial
discrimination through (1) failure to promote, and (2) hostile
work environment.  The Court will thus address these Title VII
claims that appear to be asserted in the Third Amended Complaint.

Title VII also requires that at least one actionable event
must have occurred within 180 days before the filing of the EEOC
charge (or 300 days before filing of the charge with a similar
state agency).  42 U.S.C. § 2000e-5(e)(1); <u>see</u> <u>West v. Phila.</u>
<u>Elec. Co.</u>, 45 F.3d 744, 754 n.8 (3d Cir. 1995).  Absent a
continuing violation, all discriminatory acts that are alleged to
have occurred outside of this time frame are time-barred.  <u>See</u>
<u>Amtrak v. Morgan</u>, 536 U.S. 101, 113 (2002).  To show a continuing
violation, the plaintiff must establish that (1) at least one act
of discrimination occurred within the filing period, and (2) the
harassment is more than the occurrence of isolated or sporadic
acts of intentional discrimination.  <u>Hanani v. N.J. Dep't of</u>
<u>Envtl. Prot.</u>, 205 Fed.Appx. 71, 78 (3d Cir. 2006); <u>Jewett v.</u>

27

Int'l Tel. & Tel. Corp., 653 F.2d 89, 91-92 (3d Cir. 1981);

Sicalides v. Pathmark Stores, No. 99-3465, 2000 U.S. Dist. LEXIS

8051, at *13 (E.D. Pa. June 12, 2000).

Plaintiff filed the Charge of Discrimination with the EEOC

on September 18, 2006, and received a right to sue letter from

the EEOC on October 23, 2006.  (Def. Br., Ex. E, D-10, 9-18-06

EEOC Charge of Discrimination; 3d Am. Compl., Ex. 1.)  Thus,

unless found to be a continuing violation, claims that fall

outside of the 180 day period – prior to March 19, 2006 – are

time-barred.

### 1. Failure to Promote Claim

Failure to promote is a discrete act and each incident of

discrimination and retaliatory adverse employment decision

constitutes a separate actionable unlawful employment practice

for which the limitations on filing individually applies.

Schottanes v. Bor. of N. Haledon, No. 08-3211, 2009 U.S. App.

LEXIS 16374, at *7 (3d Cir. July 23, 2009) (stating "the failure

to promote does not constitute a series of continual unlawful

acts but rather the continual ill effects from the original

violation, which is insufficient to create a continuing

violation" (quotations and citations omitted)); Hanani, 205

Fed.Appx. at 78; see Morgan, 536 U.S. at 114.  Because the

failure to promote constitutes a discrete act, there is no

continuing violation present to extend the 180 day

28

period.  As such, promotions that occurred prior to March 19, 2006, will not be considered by the Court.[10]

## 2. Hostile Environment Claim

"Hostile environment claims are different in kind from discrete acts" and therefore "some of the component acts of the hostile work environment [may] fall outside the statutory time period." Morgan, 536 U.S. at 115, 117; Riddell v. Slippery Rock Univ., No. 04-108, 2006 U.S. Dist. LEXIS 68556, at *34-*35 (W.D. Pa. Sept. 25, 2006) (comparing, in relation to the continuing violations doctrine, hostile work environment claims with failure to promote claims).  Under Morgan, "acts which are not individually actionable but may be aggregated to make out a hostile work environment claim . . . can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." O'Connor v. City of Newark, 440 F.3d 125, 126 (3d Cir. 2006).  Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court." Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 638 n.7 (2007) (quotation omitted).

---

[10]  Discrete discriminatory acts that are not timely on their own, however, may be used as background evidence to support timely claims. McCann v. Astrue, 293 Fed.Appx. 848, 850 n.3 (3d Cir. 2008).

A continuing violation, however, cannot be established where there is an interruption that destroys the pattern of harassment, i.e., the act or acts are temporally too far removed or attenuated to enable the plaintiff to keep the claim alive. See Hurley v. Atl. City Police Dep't, 174 F.3d 95, 112 (3d Cir. 1999) (finding error, albeit harmless, to admit evidence of events approximately ten years prior to core events where continuing violation not alleged as to the earlier period); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3d Cir. 1997) (holding that a seven-month break between two employment periods precluded the plaintiff from claiming a continuing violation covering acts allegedly occurring prior to the seven-month interruption); Hodges v. UPMC Presbyterian Shadyside Hosp., No. 05-310, 2007 U.S. Dist. LEXIS 14420, at *3 (W.D. Pa. Feb. 27, 2007) (finding conduct from two years earlier to be "temporally too far removed to enable [p]laintiff to keep alive her claims"); Fala v. Perrier Group of Am., No. 99-3319, 2000 U.S. Dist. LEXIS 7218, at *40-*42 (E.D. Pa. May 25, 2000) (holding that a ten-month period between the last timely act of alleged discrimination and the first untimely act precluded the plaintiff from showing a continuing violation); Sicalides, 2000 U.S. Dist. LEXIS 8051, at *16 (finding that a three-month gap between the last timely act of alleged discrimination and the prior, untimely act precluded the plaintiff from establishing a continuing violation); Lesko v. Clark Publisher Servs., 904 F.Supp. 415, 420 (M.D. Pa. 1995)

30

(holding that a two-year passage of time between the first and second alleged instances of harassment indicated that they were separate and distinct).

Plaintiff alleges that there were various events that created a hostile work environment. (7-23-09 Oral Hearing; <u>see also</u> 3d Am. Compl.; Pl. Br.)  Although plaintiff appears to contend that the effects of the hostile work environment were continually felt, he does not appear to point to one specific event that occurred within the 180 day period - between September 18, 2006 and March 19, 2006.  (<u>See</u> <u>supra</u> Background § II.)  <u>See</u> <u>Frederick v. Reed Smith Shaw & McClay</u>, No. 92-0592, 1994 U.S. Dist. LEXIS 1809, at *23 (E.D. Pa. Feb. 18, 1984) ("[F]or a plaintiff's hostile work environment claim to be timely, even when it is based on a continuing violation theory, there must be some conduct within the limitations period, and not the mere feeling of the effects."); <u>Lewis v. Sheridan Broad. Network</u>, 04-1015, 2005 U.S. Dist. LEXIS 26762, at *15-*16 (W.D. Pa. Nov. 7, 2005) (finding record did not demonstrate hostile work environment claims fell inside of the statutory period).

Assuming <u>arguendo</u> that there was a specific incident that fell within the 180 day period, the Court finds that plaintiff cannot establish a continuing violation beyond his October 2002 transfer to the Ewing store.  Plaintiff willingly accepted the offer to transfer to the Ewing store, after declining the requested transfer to a Virginia store, and was promoted to a

management position.  The passage of time between any alleged
instances of harassment at the Mount Laurel store and alleged
incidents of harassment at the Ewing store show that the
instances were separate and distinct.[11]  As such, incidents
occurring prior to plaintiff's transfer to the Ewing store will
be considered only as background.

**B.   Section 1981 Claims**

Section 1981 "affords a federal remedy against
discrimination in private employment on the basis of race."
Johnson v. Railway Express Auth., 421 U.S. 454, 460 (1975).
Regarding plaintiff's Section 1981 claims, the Court uses the
same analysis in assessing the substantive merit of the claims
and the applicability of a continuing violation theory applied
for Title VII claims, except there is a four-year statute of
limitations.  Verdin v. Weeks Marine, 124 Fed.Appx. 92, 96 (3d
Cir. 2005); Sung Tran v. Delavau, LLC, No. 07-3550, 2008 U.S.
Dist. LEXIS 39001, at *34-*36 (E.D. Pa. May 13, 2008) (applying
four-year statute of limitations to a claim of pay and promotion
discrimination, retaliation, and hostile work environment); see
generally Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369
(2004).  Plaintiff filed the Complaint on March 1, 2006.  (See
dkt. entry no. 1, Compl.)  Upon application of a four-year

---

[11]  The Court further notes that plaintiff fails to address the
statute of limitations issue, or allege any continuing violation.
(See Pl. Br.)

limitations period and absent the application of a continuing
violation theory, all events which occurred before March 1, 2002
are time-barred for the purposes of plaintiff's Section 1981
claims.  See, e.g., Youssef v. Anvil Int'l, 595 F.Supp.2d 547,
564 (E.D. Pa. 2009) (noting that, although hostile work
environment claim would be barred under Title VII, it was not
barred under Section 1981).

## III. Failure to Promote Claim

Plaintiff alleges that he was the victim of race
discrimination because non-African-American employees were given
preferential treatment regarding promotions to salaried
management positions.  (Pl. Br. at 4.)  Plaintiff contends that,
although he "increased substantially and exceeded previous annual
sales figures three years in a row," and "had expectations that
based on his performance [] he would advance to a salaried
management position . . . [,] other employees with less
experience and skills were . . . promoted over him, despite
having constantly appl[ied] for the assistant manager's
position."  (Id.; Pl. Dep. at 913.)  He contends that, despite
being qualified and on the "Job Preference List," he was not
asked to interview for an Assistant Store Manager position.  (Pl.
Br. at 4.)  Home Depot, however, asserts that plaintiff's failure
to be promoted to a salaried management position was not based on
his race, but that plaintiff lacked interpersonal skills and

leadership ability and thus was not qualified for a salaried management position.  (Def. Br. at 13-24.)

To succeed on a Title VII or Section 1981 claim of race discrimination, a claimant must establish that he was the subject of purposeful discrimination.  Weldon v. Kraft, 896 F.2d 793, 796 (3d Cir. 1990); see Verdin, 124 Fed.Appx. at 96 (using Title VII analysis to evaluate Section 1981 claim).  Where the plaintiff, as here, does not present direct evidence of discrimination, a court will apply a three-step, burden-shifting analysis. McDonnell Douglas Corp., 411 U.S. at 802-03; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1065-66 (3d Cir. 1996).

Plaintiff first has the burden of establishing a prima facie case of discrimination.  See McDonnell Douglas Corp., 411 U.S. at 802 & n.13 (noting that the facts necessary to establish the prima facie case will vary for each case).  Broadly, it requires the plaintiff to assert (1) he is a member of a protected class, (2) he possess the necessary qualifications for the position, (3) he was subject to an adverse employment action, i.e. failure to promote or denial of opportunities, and (4) the circumstances surrounding the employer's actions raise a presumption of improper motive.  Pivirotto v. Innovative Sys., 191 F.3d 344, 352-56 (3d Cir. 1999); Sampath v. Concurrent Techs. Corp., No. 03-264, 2008 U.S. Dist. LEXIS 25715, at *95-*96 (W.D. Pa. Mar.

31, 2008), <u>aff'd</u>, 299 Fed.Appx. 143 (3d Cir. 2008).  A
plaintiff's qualifications, at this stage of review, are
determined by an objective standard, and subjective qualities
"such as leadership or management skill" are left for later in
the inquiry.  <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d
Cir. 1995) (quotations and citations omitted); <u>Jalil v. Avdel
Corp.</u>, 873 F.2d 701, 707 (3d Cir. 1989).

     To satisfy this burden for a failure to promote claim,
plaintiff must at minimum show that there was either (1) the
possibility of someone being promoted to the position he sought
and the position remained open, or (2) an employee who was
promoted to the position under circumstances that would support
an inference of an impermissible discriminatory motive.  <u>See
Sampath v. Concurrent Techs. Corp.</u>, 299 Fed.Appx. 143, 145 n.3
(3d Cir. 2008); <u>Pivirotto</u>, 191 F.3d at 356-57; <u>Barber v. CSX
Distrib. Servs.</u>, 68 F.3d 694, 698 (3d Cir. 1995).

     If the plaintiff succeeds, then the burden of production
shifts to the defendant to "articulate some legitimate,
nondiscriminatory reason" for the adverse employment action.
<u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  If the
defendant makes such a showing, the plaintiff must then
demonstrate by a preponderance of the evidence that the stated
nondiscriminatory rationale was a mere pretext for
discrimination.  <u>Id.</u>

## A.    Plaintiff's Prima Facie Case

It is undisputed that, for both the Title VII and Section 1981 claims, plaintiff meets the first and third prongs of the prima facie case, as (1) he is African American and thus a member of a protected class, and (2) he was subject to an adverse employment action by failing to receive a promotion.

The second prong requires that plaintiff be qualified for the job to which he failed to be promoted.  There are two salaried management positions that a Home Depot employee may be promoted to – Assistant Store Manager and Store Manager.  (7-23-09 Oral Hearing.)  According to Home Depot policy, to be qualified for promotion to a salaried management position, an employee must be a Department Head who has completed one full performance cycle year and has received a "promotable" rating. (Benson Decl. at 2.)[12]

Plaintiff transferred to the Ewing store in October 2002. From October 1, 2002 through June 2008, the Court has been notified of only five employees who were promoted from Department Head to Assistant Store Manager at the Ewing store: (1) Andrew Nesham on September 20, 2004; (2) Alfred Quinn on March 27, 2006;

---

[12]  An eligible employee must register his interest in a promotion.  (Benson Decl. at 2.)  The employee, if meeting the criteria, may then be invited to participate in a retail management assessment, consisting of testing that results in a standardized score.  (Id.)  The slate is sorted by the highest scores, and consists of employees nationwide.  (Id.)

36

(3) Candace Smith on August 21, 2006; (4) Katie Clugsten on January 22, 2007; and (5) Robert Saultz on October 1, 2007.  (Pl. Exs., Attach. A, Promotions List.)  Each of these individuals is Caucasian.  (Id.)

Plaintiff held the position of Department Head from October 2002 through approximately October 2005.  Thus, the only promotion to the salaried Assistant Manager position that plaintiff would have been eligible for was the September 20, 2004 promotion.[13]  Under Title VII, however, plaintiff is time-barred from asserting a Title VII failure to promote claim for the September 20, 2004, promotion as it falls outside of the 180 day period discussed supra.  The Court, accordingly, finds that summary judgment should be granted in favor of Home Depot as to the failure to promote Title VII claim, as plaintiff has

---

[13] The Court has not been provided with evidence of any other relevant promotions to Assistant Store Manager at the Ewing Store or elsewhere.  All other promotions described by plaintiff during his deposition fall outside of the period plaintiff was qualified to receive such a promotion.  (See Def. Br. at 14.)

not established that he was qualified for any promotion during
the relevant statutory period.[14]

Under Section 1981, however, the Court is not time-barred
from considering the September 20, 2004, promotion.  Plaintiff
thus may satisfy the second prong of the prima facie test by

_____

[14] The Court acknowledges that plaintiff contends he did not
voluntarily relinquish his Department Head position and willingly
take himself out of eligibility for promotion to a salaried
position, but that he relinquished the position due to the lack
of support he believes he received from management.  (See Pl.
Exs., P-5, 10-17-05 Letter.)  Plaintiff, in essence, alleges a
constructive discharge claim, although does not frame the Third
Amended Complaint as such.  Hare v. Potter, 220 Fed.Appx. 120,
135 (3d Cir. 2007) ("Constructive discharge occurs when an
employer knowingly permits conditions of discrimination in
employment so intolerable that a reasonable person subject to
them would resign.  To prove constructive discharge, the
plaintiff must demonstrate a greater severity or pervasiveness of
harassment than the minimum required to prove a hostile working
environment.") (internal quotations and citations omitted);
Spencer v. Wal-Mart Stores, 469 F.3d 311, 317 n.4 (3d Cir. 2006).
Such an allegation, however, is not contained in the Third
Amended Complaint, and thus will not be addressed by the Court.
See Buchanan v. W. Whiteland Twp., No. 08-462, 2008 U.S. Dist.
LEXIS 106149, at *9 n.3 (E.D. Pa. Jan. 7, 2009); see also
Williams v. DeTella, No. 94-6498, 1997 U.S. Dist. LEXIS 14856, at
*17, n.9 (N.D. Ill. Sept. 19, 1997) ("While materials outside the
complaint may explain the complaint, they cannot amend it to add
new claims."); cf. Konstantopoulos, 112 F.3d at 715 (finding "a
Title VII plaintiff to expand the complaint beyond the specific
elements contained in the charge before the EEOC.  Under such a
rule, the elements which form the subject matter of the complaint
may be broader than the charge, so long as those elements are
reasonably related to the charge or may reasonably be expected to
grown out of it.")
Without stating an opinion on the issue, the Court notes
that it is unclear that plaintiff would be able to establish that
Home Depot's conduct was so intolerable that a reasonable person
would have felt compelled to resign, and that the conduct
demonstrated "something more" than a hostile work environment
claim.  See Neely v. McDonald's Corp., No. 07-2186, 2009 U.S.
App. LEXIS 17747, at *9 (3d Cir. Apr. 10, 2009); supra § III.

presenting credible evidence that he can meet the minimum
objective criteria required for the employment.  See Sempier, 45
F.3d at 729 ("While objective job qualifications should be
considered in evaluating the plaintiff's prima facie case, the
question of whether an employee possesses subjective quality . .
. is better left to consideration of whether the employer's
nondiscriminatory reason for discharge is pretext.") (quotations
omitted); Wexler v. White's Fine Furniture, 317 F.3d 564, 574-76
(6th Cir. 2003) (noting that pertinent factors include education,
experience in the relevant industry, and demonstrated possession
of relevant skills).  Satisfactory employment performance "over a
long period of time" has been deemed to meet this burden.
Sempier, 45 F.3d at 729.

Based on this analysis, the Court finds there is sufficient
evidence in the record to demonstrate that plaintiff was
objectively qualified for a promotion.  Although plaintiff,
inter alia, received certain feedback documenting his need to
improve in specified areas and was after one review placed on a
PIP, upon evaluation of plaintiff's reviews from the time of his
transfer to the Ewing store through September 2004, and upon
review of the evidence in the light most favorable to plaintiff,
plaintiff's performance history demonstrates that there is
sufficient objective criteria to determine that plaintiff was
qualified for a promotion in September 2004.

39

The Court, moreover, finds that plaintiff is able to establish the fourth prong of the prima facie case regarding an inference of discrimination.  It is undisputed that, while there were African Americans promoted to Department Head positions during the relevant time period, no African Americans were promoted to salaried management positions in the Ewing store. See Sampath, 299 Fed.Appx. at 143 n.3; Barber, 68 F.3d at 698; see also Eaddy v. Pa Dep't of Pub. Welfare Berks County Assistance Office, No. 04-5909, 2006 U.S. Dist. LEXIS 11674, at *17 (E.D. Pa. Mar. 20, 2006) ("An inference of discrimination arises because all the candidates were considered relative equals going into the interview process and thus similarly situated, but none of the successful candidates were African-American"). Plaintiff thus is able to make the prima facie showing under Section 1981.

### B.   Home Depot's Legitimate, Nondiscriminatory Reason for Failing to Promote Plaintiff

Home Depot asserts that plaintiff was not promoted due to his lack of interpersonal skills and leadership ability, and presents various performance reviews to support this assertion. (Def. Br. at 13-24.)  The Court finds that Home Depot has produced evidence of a legitimate, nondiscriminatory reason for plaintiff's failure to receive a promotion to rebut the presumption of discrimination created by the prima facie case. See Sampath, 2008 U.S. Dist. LEXIS 25715, at *108 (finding

40

defendant's stated reason of lack of leadership and "people skills" as a legitimate, nondiscriminatory reason to rebut a prima facie case of failure to promote).

**C.    Whether the Legitimate, Nondiscriminatory Reason Proffered by Home Depot was a Pretext for Discrimination**

To counter Home Depot's showing, "plaintiff must prove not that the illegitimate factor was the sole reason for the decision, but that the illegitimate factor was a determinative factor in the adverse employment decision, that is, that but for the protected characteristic," plaintiff would have been promoted to a salaried management position.  <u>Fuentes</u>, 32 F.3d at 764.  A plaintiff may prevail by showing "pretext," or simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination.  <u>Watson v. Se. Pa. Transp. Auth.</u>, 207 F.3d 207, 215 n.5 (3d Cir. 2000).  To survive summary judgment, plaintiff must present sufficient evidence to either: (i) "cast substantial doubt upon" Home Depot's proffered reasons for failing to promote him "by painting them as weak, implausible, contradictory, or incoherent;" or (ii) establish a basis from which a factfinder could

> reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (<u>e.g.</u>, by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his

protected class or other protected categories of
persons.)

Fuentes, 32 F.3d at 765.

The Court finds that, at this stage, plaintiff is able to
meet this burden.  Home Depot has produced evidence that to be
promoted to a salaried management position, a Department Head
must be labeled as "promotable," and plaintiff was not labeled as
"promotable" at the time of the September 20, 2004, promotion.
(See Benson Decl. at 2; Def. Br., Ex. E, D-51, 1-4-04 Performance
and Development Summary (noting plaintiff had to grow in his
position before being labeled "promotable"); id., D-54, 7-22-04
Performance and Development Summary (same); dkt. entry no. 55,
Def. Reply Br. at 4.)

Plaintiff, however, has provided numerous letters from
customers, as well as Home Depot employees, that present a
genuine issue of material fact as to plaintiff's "promotability,"
and cast doubt on Home Depot's legitimate, nondiscriminatory
reason for failing to promote plaintiff.  See Youssef, 595
F.Supp.2d at 562-63 (finding letter presenting contradictory
testimony regarding failure to promote claim presented factual
dispute to be resolved at trial).  Plaintiff presents a letter
from a former supervisor - an Assistant Store Manager during the
time plaintiff was Pro Desk Supervisor – that contradicts his
poor performance reviews and other evidence in the record.  The
Assistant Store Manager writes that plaintiff "has proved himself

to be the best Department Manager for the Pro Desk that I have ever worked with in the 11 stores that I have ran for Home Depot." (Pl. Exs., D-96, 8-20-07 Letter.)  The letter concludes by stating that plaintiff "is always looked up to as a head coach & always goes above & beyond his call of duty," "could be a general store manager for Home Depot if he was yielded the opportunity," and is "the most honest, trustworthy employee Ewing, Home Depot will ever have."  (Id.)[15]  The letter was

_____

[15]  The letter in its entirety states:
      It has been a pleasure and honor to work with
      [plaintiff] the past 4 years in Ewing, Home Depot.  In
      my tenure as Assistant Store Manager for Home Depot for
      17 years, [plaintiff] has proved himself to be the best
      Department Manager of the Pro Desk that I have ever
      worked with in the 11 stores that I ran for the Home
      Depot.  [Plaintiff] is fair and consistent in all of
      his actions.  He is the most respected associate in the
      Ewing, Home Dept.  He helps all fellow Department
      Managers & Assistant Managers in all special projects
      within the store. [Plaintiff] is a very talented man
      with tremendous product knowledge in every single
      department within the Home Depot.  I don't think there
      is a question that can't be answered by [plaintiff]
      about anything within the store.  This all leads back
      to [plaintiff] when he was a general contractor for 20
      years.  Not only has [plaintiff] run the pro desk for
      myself for 2 years, [plaintiff] has been assigned to
      many special projects within the store.  He took it
      upon himself to drastically increase our new contractor
      charge accounts and also consumer accounts.  No one has
      been able to come close to the amount of new accounts
      [plaintiff] opened in the time he took charge of that
      special project.  [Plaintiff] also had the largest
      increase of sales when he ran the pro desk, 2005 he was
      selling $700,000 over sales plan for that year.  He
      also did a tremendous job in selling our customers
      installation services by Home Depot.  He still holds
      the record for the most installation leads within our
      district.  He beat out 5 other stores in this category.
      I cannot stay enough positive things about [plaintiff].

written by the same Assistant Store Manager who conducted
plaintiff's poor September 2005 review, which led plaintiff to
resign his management position, and who once referred to
plaintiff as "the worst manager that I've ever seen."  (See Def.
Br., Ex. E, D-56, 8-05 Performance and Development Summary; Pl.
Dep. at 971.)

     Plaintiff also presents letters from his former employees in
the Pro Desk Department, praising his interpersonal skills and
leadership abilities.  One former employee states that he had
"worked in many different settings over the years and . . . found
that [plaintiff] [w]as the most effective and consistent
supervisor that [he had] experience dealing with."  (Pl. Exs., P-
11, 2-7-06 Letter.)  He further states:

> I spent over a year under [plaintiff's] supervision at Home
> Depot and I have since compared many of subsequent
> supervisors/ managers to [plaintiff].  He always seemed to
> remain calm and rational in his decisions.  I have a lot of
> respect for him and his management style.  He is fair to all
> of his associates and treats all of his employees fair and
> consistently.  Over the year or so that [sic] worked with
> [plaintiff] I observed him placed in many different
> situations.  I feel he was sincere in caring for all the
> people that worked for him and with him.  He placed

---

> I will again say [plaintiff] is the best Home Depot
> associate I have ever worked with.  [Plaintiff] could
> be a general store manager for Home Depot if he was
> yielded the opportunity.  [Plaintiff] is looked up to
> as a head coach & always goes above & beyond his call
> of duty.  In my closing I will state that [plaintiff]
> is the most honest, trustworthy employee Ewing, Home
> Depot will ever have.  Keep up the great work &
> positive attitude!

(Pl. Exs., D-96, 8-20-07 Letter.)

> expectations on his employees and was consistent on his
> expectations for all.  I would if given the opportunity work
> for [plaintiff] without hesitation.

(Id.)

Another former employee writes that plaintiff "always was
very respectful and personable to customers and staff" and "a
good manager to work for."  (Pl. Exs., P-12, 2-28-06 Letter.)
The letter explains that plaintiff "always took time to share his
knowledge and attempted to make sure his staff worked effectively
and were customer sensitive," and the employee "felt [plaintiff]
was one of the best examples of the qualities Home Depot expects
from their staff."  (Id.)  Another former employee, moreover,
writes that during the time he worked for plaintiff, he "found
[plaintiff] to be fair and honest to all the people that worked
for him as well as anyone that he came in contact with on a daily
basis.  He truly cared about the well-being of associates, his
department, and the Home Depot as a whole and in return demanded
and expected results for the benefit of all."  (Pl. Exs., P-13.)

Plaintiff, moreover, has presented various letters from
customers expressing their satisfaction with plaintiff's service
to them, including a February 2, 2006, letter from one contractor
urging Home Depot to restore him to the Pro Desk, as the
contractor missed "the expertise that [plaintiff] has
demonstrated and f[ou]nd that [he] did not have the same
confidence in dealing with Home Depot that [he] had previously
had."  (Pl. Exs., P-8, 2-2-06 Letter; see also id., P-10 (stating

45

plaintiff is "one of Home Depot's greatest assets"); id., P-9, 2-1-07 Letter (stating plaintiff "is an instrumental factor to the Ewing store.  He is extremely knowledgeable.  Many employees defer to him for advice on products to provide service to other customers."); id., P-7, 1-31-06 Letter ("I just felt that this letter needed to be written for this man because he has been an asset to your organization.").)

While, as a general matter, a court "may not second-guess an employer's evaluation of its employees," whether an employer has "misjudged" an employee's performance is relevant to the question of pretext.  Sempier, 299 Fed.Appx. at 146; Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[I]f the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." (emphasis added)).[16]

Plaintiff's performance reviews show at least some inconsistencies.  For instance, while the majority of plaintiff's reviews repetitively praise his skill at dealing with customers and knowledge of the store and its products, the November 2003 review, after which plaintiff was placed on the PIP that he contends he was forced to sign through intimidation and harassment, notes that plaintiff needs "key development" in the

---

[16]  The Court is not making any evidentiary rulings in referring to the contents of these letters from customers and fellow employees.  Plaintiff will have to meet the requirements of the rules of evidence if he seeks to present such information at trial.

areas of product knowledge and customer service.  (See Def. Br.,
Ex. E, D-48, 11-14-03 Performance and Development Summary; cf.
id., D-42, 1-28-03 Performance and Development Summary; id., D-
44, 8-1-03 Performance and Development Summary; id., D-51, 1-4-04
Performance and Development Summary.)  Cf. Sempier, 299 Fed.Appx.
at 146 (finding the employee's positive reviews to be consistent
with the negative assessments of his personality traits, and the
former not to undermine the latter); Valdes v. Union City Bd. of
Educ., 186 Fed.Appx. 319, 323 (3d Cir. 2006) (finding, although
plaintiff was of the opinion defendant "treated him wrongfully,
unprofessionally, and unfairly," plaintiff offered "no evidence
to rebut the explanations the [defendant] provided to support its
decisions with respect to [plaintiff's] promotion claims.")

     The Court thus finds that plaintiff's failure to promote
claim cannot be decided on the summary judgment record because
genuine issues of material fact are in dispute.  Accordingly, the
Court will deny the motion to the extent it seeks summary
judgment on the Section 1981 failure to promote claim.  See
Hargrave v. County of Atl., 262 F.Supp.2d 393, 410 (D.N.J. 2003)
(holding summary judgment should be denied if "the party opposing
the motion provides evidence such that a reasonable jury could
return a verdict in favor of the nonmoving party") (citations and
quotations omitted).

**IV.  Hostile Work Environment**

　　　To assert a prima facie case of hostile work environment,
plaintiff must allege (1) he suffered intentional discrimination
because of his race, (2) the discrimination was severe or
pervasive, (3) the discrimination detrimentally affected him, (4)
the discrimination would detrimentally affect a reasonable person
in like circumstances, and (5) the basis for employer liability
is present.  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)
(citations and footnotes omitted), overruled in part on other
grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53
(2006); see also Tucker v. Merck & Co., 131 Fed.Appx. 852, 858
(3d Cir. 2005) (applying the same standard to a Section 1981
hostile work environment claim).

　　　A court must consider the totality of the circumstances when
determining whether the alleged harassment is sufficiently severe
or pervasive to constitute a hostile work environment.  Andrews
v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  Factors
that may indicate a hostile work environment include: (1) the
frequency of the discriminatory conduct; (2) its severity; (3)
whether it is physically threatening or humiliating, or a mere
offensive utterance; and (4) whether it unreasonably interferes
with an employee's work performance.  Harris v. Forklift Sys.,
510 U.S. 17, 23 (1993).

　　　With regard to the employer liability element, "[a]n
employer is not always vicariously liable for a hostile work

48

environment" and "much turns on whether the harassers are
supervisors or coworkers." Hitchens v. Montgomery County, 278
Fed.Appx. 233, 235 (3d Cir. 2008) (citations and quotations
omitted); Andreoli v. Gates, 482 F.3d 641, 648 (3d Cir. 2007);
see Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). If
a supervisor creates the hostile work environment, the employer
is liable for the supervisor's conduct, provided the supervisor
took "tangible employment action" against the employee, which
includes actions such as "discharge, demotion, or undesirable
reassignment." See Faragher, 524 U.S. at 807; Burlington Indus.
v. Ellerth, 524 U.S. 742, 765 (1998); Hitchens, 278 Fed.Appx. at
236. If the supervisor charged with creating the hostile
environment failed to take a "tangible employment action" against
the employee, however, the employer may avail itself of an
affirmative defense to liability by showing it exercised
reasonable care to avoid the harassment and that the employee
failed to take advantage of safeguards. Amati v. U.S. Steel
Corp., 204 Fed.Appx. 131, 133-34 (3d Cir. 2008) (finding

defendant took prompt, immediate action to investigate matter after initial complaint).[17]

Plaintiff appears to allege six incidents with racial connotations that created a hostile work environment at the Ewing store: (1) the stealing accusations; (2) the noose incidents; (3) the "negro" product description incident; (4) the Confederate flag sticker incident; (5) the "ghetto store" comments; (6) the "white power" comment; and (6) the "x" apron incident. (See supra Background.)  Plaintiff also alleges that a hostile work environment was created through the various instances when management refused to provide him with support.   Plaintiff fails to establish a prima facie claim of hostile work environment. With regard to the alleged stealing accusations made against plaintiff in 2003, the Court finds that plaintiff has not presented evidence indicating that he suffered intentional discrimination because of his race.  Plaintiff has admitted that other employees of various race and ethnicity were confronted for

_____

[17]  In the case of a coworker rather than a supervisor, an employer is liable for harassing conduct if it is "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." Andreoli, 482 F.3d at 644 (internal quotations and citations omitted); see McCloud v. United Parcel Serv., No. 08-1700, 2009 U.S. App. LEXIS 10830, at *7-*8 (3d Cir. May 21, 2009).  An employer will be found negligent only if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." Andreoli, 482 F.3d at 644 (internal quotation and citation omitted).  "Prompt remedial action" is defined as conduct "reasonably calculated to prevent further harassment." Bonenberger v. Plymouth Township, 132 F.3d 20, 26 (3d Cir.1997); see Hitchens, 278 Fed.Appx. at 236.

stealing from the store while he was employed there.  See Connell v. Nicholson, 318 Fed.Appx. 75, 76 (3d Cir. 2009) (stating that the critical issue when determining first prong of prima facie case of hostile work environment is whether members of one protected class are exposed to disadvantageous terms or conditions of employment to which others are not exposed).

With regard to the noose found by plaintiff, Home Depot investigated the incident within twenty-four hours of plaintiff informing management.  Home Depot also met with plaintiff to address his particular concerns regarding the incident.  Although no employee appears to have been punished because the investigation was inconclusive, the investigation and meetings were "reasonably calculated to prevent further harassment."  Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997).  As Home Depot's remedial action was both prompt and adequate, plaintiff's hostile environment claim regarding the noose incident fails.  See McCloud, 2009 U.S. App. LEXIS 10830, at *7-*8.[18]

With regard to the incident with plaintiff's apron, the Court finds that plaintiff has not presented evidence indicating that he suffered intentional discrimination because of his race.  Plaintiff has offered no evidence to suggest that non-African

---

[18] Plaintiff asserts that there was another noose incident at the Ewing Store in 2007, although he did not actually view the noose. He contends management was notified.  He further contends a noose was present in the Mount Laurel Store in 1998, the year he commenced employment with Home Depot, although he did not see the noose.

American employees in plaintiff's position were permitted to wear aprons that did not have their name on them.  See Connell, 318 Fed.Appx. at 76.  The Court also finds that Home Depot's remedial action was prompt and adequate.  Plaintiff called the Awareness Line to report the incident, the incident was investigated and reported by Home Depot, and no evidence of harassment was found.  See McCloud, 2009 U.S. App. LEXIS 10830, at *7-*8.

The Court finds no evidence that the Confederate flag sticker placed on an employee's car was related to plaintiff's employment or work environment.  Plaintiff has not alleged that the Confederate flag sticker was ever brought into, or discussed, in Home Depot.  It thus appears that this incident did not arise out of the employment relationship and did not create, or enhance, a hostile work environment.  Cf. Ferguson v. Deptford Twp., No. 06-2112, 2008 U.S. Dist. LEXIS 105144, at *4-*5 (D.N.J. Dec. 22, 2008).[19]

With regard to the remainder of plaintiff's contentions, including the "negro" description, the "ghetto store" comments, and the "white power" comment, the Court does not find that there has been a showing of severe and pervasive conduct to meet the prima facie showing.  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

_____

[19] Home Depot contends this issue was investigated by management after plaintiff mentioned it in a November 2005 letter.  (Def. Br. at 34.)  The Court, however, has found no other evidence of an investigation as to this issue in the record it was presented.

discriminatory changes in the terms and conditions of employment." Shramban v. Aetna, 115 Fed.Appx. 578, 580 (3d Cir. 2004).  Title VII will not support complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, . . . jokes, and occasional teasing." Faragher, 524 U.S. 775, 788 (quotations and citations omitted); see also Woodard v. DHB Die Casting, 255 Fed.Appx. 608, 609-10 (3d Cir. 2007) (failing to find hostile work environment where African-American plaintiff's race was referred to as "you people," he was asked if he planned to execute a drug deal during a bathroom break, and graffiti of a burning cross and Ku Klux Klan sign remained posted on the bathroom wall for three months after plaintiff reported it to his employer); Lassiter v. Children's Hosp. of Phila., No. 05-6834, 2008 U.S. Dist. LEXIS 7579, at *24 (E.D. Pa. Jan. 31, 2008) (failing to find hostile work environment where plaintiffs were not referred to with racial slurs, comments were subject to non-racial interpretation, comments were not physically threatening or humiliating, and comments did not interfere with plaintiffs' work performance); cf. Cardenas v. Massey, 269 F.3d 251, 266-68 (3d Cir. 2001) (finding a hostile work environment where employer referred to plaintiff as "the boy from the barrio" and "mojado," asked him during disagreements if he would pull a switchblade to resolve them, posted derogatory messages in plaintiff's cubicle, rounded evaluation scores of all other employees up while rounding

53

plaintiff's down, intentionally gave plaintiff contradictory and impossible instructions, and referred to him as an "affirmative-action hire"). The statements complained of, furthermore, are all subject to non-racial interpretation. See Lassiter, 2008 U.S. Dist. LEXIS 7579, at *24.

The Court emphasizes that it does not review the individual incidents in isolation; rather, as discussed supra, the Court must consider the totality of the circumstances. The frequency of the conduct of the alleged racially based hostile work environment claims appears to be minimal, as the events alleged to have occurred took place over years. See Davis v. City of Newark, 285 Fed.Appx. 899, 902-03 (3d Cir. 2008). Plaintiff, moreover, has not claimed that any of the alleged events involved physical threats or humiliations, or unreasonably interfered with his work performance. Id. Plaintiff continuously emphasizes his stellar performance, and submits various letters to reiterate the point.

With regard to the allegations that management failed to support plaintiff, the Court finds no evidence to support plaintiff's conclusion that it resulted from racial animus. See Davis, 285 Fed.Appx. at  902-03.; see also Cardenas, 269 F.3d at 262 (recognizing that the advent of more sophisticated and subtle forms of discrimination requires the Court to analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially

neutral mistreatment).  While it is not necessary for a Title VII defendant to use words that overtly implicate racial animus to create a hostile work environment, conduct that cannot be reasonably construed as invoking any racial feeling does not support Title VII liability.  See Davis, 285 Fed.Appx. at 902-03. The remaining incidents described by plaintiff appear to implicate his personality, temperament, and the other various factors that tend to cause favor or disfavor between supervisors and coworkers, rather than racial issues.

Plaintiff, moreover, fails to establish that the alleged conduct was objectively offensive – that a reasonable person would have found the conduct "hostile or abusive." Page v. Tr. of the Univ. of Penn., 22 Fed.Appx. 144, 146 (3d Cir. 2007). Although plaintiff has shown that such conduct may have detrimentally affected him, he failed to make a showing that it would have detrimentally affected a reasonable person in the same position.  See Shramban, 115 Fed.Appx. at 580.  While the Court recognizes that plaintiff was a motivated employee who took pride in his work, plaintiff cannot sustain a hostile work environment claim simply by asserting an event or a disagreement with his supervisors and then asserting that it was motivated by an overall environment of racial bias.  The Court, moreover, notes that Home Depot appears to have promptly investigated every one of the complaints plaintiff made to the Awareness Line.  (See supra Background.)  The Court, accordingly, will grant Home

55

Depot's motion to the extent that it seeks summary judgment as to the hostile work environment claim.

## CONCLUSION

For the reasons stated _supra_, the Court will grant the motion to the extent that Home Depot seeks summary judgment in its favor as to the (1) the Title VII failure to promote claim, and (2) the hostile work environment claims.  The Court will deny the motion to the extent that it seeks summary judgment as to the Section 1981 failure to promote claim.  The Court will issue an appropriate Order and Judgment.


                                        s/ Mary L. Cooper
                                      **MARY L. COOPER**
                                      United States District Judge


Dated:    September 11, 2009